# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 91
The People &c.,
        Respondent,
    v.
J.L.,
        Appellant.

Cynthia Colt, for appellant.
Dmitriy Povazhuk, for respondent.

RIVERA, J.:

The sole issue on this appeal is whether the trial court's denial of defendant J.L.'s

request for a jury instruction on voluntary possession, in connection with a third-degree

- 1 -

criminal possession of a weapon count, constitutes reversible error. We conclude that the evidence supported the jury charge and the error warrants a new trial on this count.

Defendant was tried on charges of criminal possession of a weapon and unlawful possession of marihuana. Defendant was 17 years old when he was arrested and, if his version of the underlying events is believed, although he was in the wrong place at the wrong time, he was not in possession of a weapon. According to the prosecution, defendant was criminally liable for constructive possession of a gun because he had dominion and control over the bedroom where the gun was found. Defendant maintains that he did not live in the apartment and was a temporary guest with no prior knowledge of the gun, and that he discovered it unintentionally in the moments after he was shot, before leaving to get assistance.

In the prosecutor's case-in-chief, the two police officers who responded to an emergency call testified that they found defendant sitting outside of a residential building, bleeding from the back of his neck. Defendant told the officers that he had been shot while he was in the kitchen of the building's basement apartment. During a search of the apartment, one of the officers followed a trail of blood into a back bedroom, where he saw pools of blood on the floor, a bucket of plaster, garbage bags, a mattress with a foam topper and blanket, and some dressers. The officer found a Military Armament Corporation Model 11 submachine gun (MAC 11) in an open drawer, as well as three small bags of marihuana on top of another dresser.

The officer further testified that the MAC 11 was under a piece of paper. A photograph admitted into evidence showed the gun on top of an envelope which was addressed to defendant at a different location and had the words "Important Insurance Documents Enclosed" printed on it. Although the officer did not remember if the envelope was in the drawer when he found the gun, another officer who arrived three hours later said that he saw the envelope under the gun and that the gun appeared to have blood on it.

The officer who first found the MAC 11 also searched a second bedroom, where he saw a fully made bed, some clothing, a dresser, bottles of alcohol, a child's photograph, and a Bible. In an open dresser drawer, the officer found an unloaded revolver, money, and an envelope. When he searched the kitchen, he saw a refrigerator and a window covered with bullet holes, a loaded gun in an open drawer, a marihuana cigarette, and loose marihuana on the floor amid broken glass.

Two police officers interviewed defendant in the hospital emergency room later that night. According to one of the officers, defendant provided an incorrect name and birthdate and said he lived with his aunt and was shot outside of her home. However, defendant later told this officer that he had paid $100 to someone named Paul, whom he had recently met, to stay in an extra room in Paul's home. Defendant was in the kitchen of Paul's apartment when he heard the gunshots. He ran to the back bedroom when he discovered that he had been shot, and then ran upstairs to ask a neighbor to call 911. He did not know who shot him.

The prosecutor did not present any evidence as to who was renting or living in the apartment or whether the police had made any efforts to locate Paul. Nor was there evidence disputing defendant's statements to the police that he lived with his aunt.

No fingerprints were recovered from any of the weapons, but a criminalist testified that she determined defendant was one of at least two people who contributed DNA to samples taken from the MAC 11. However, she could not say where defendant's DNA was found on the gun or when or how it had gotten there. She also testified that there was no way to determine the exact source of DNA and that, although she did not specifically test for the presence of blood on the MAC 11, it was possible that defendant's blood dripped onto the gun or that the DNA was transferred there by a third party. The officer who collected the DNA samples testified that he did not remember seeing blood on any of the guns.

Defendant took the stand in his defense. He testified that he was randomly shot in the neck and chest while sitting in the kitchen of the basement apartment where he was planning to spend the night after his aunt put him out of her home for fighting with his brother. While he was in the kitchen smoking marihuana with Paul, defendant heard three gunshots. When he realized that he had been shot in the neck and was bleeding, he ran to the back bedroom where he would be staying to look for a towel. It was his first time in the room and, in an open drawer, he saw what he later told the police appeared to be a gun but denied picking it up. After he found a towel on top of the dresser, he went upstairs and told a neighbor to call 911.

Defendant was sitting outside on the building's steps when the police arrived. In response to their questioning, defendant explained that he had been shot in the kitchen by someone in the alleyway outside. He controverted the police testimony and denied having given a false name and birthdate at the hospital. Defendant further explained for the jury that, because he had an appointment regarding an insurance matter the following day, the only thing he brought to the apartment was an envelope with the materials for the meeting, and that he placed the envelope on top of the refrigerator, not in the dresser.

Defendant also presented testimony from another officer who said that he found defendant at the building, holding a towel around his bleeding neck, and that defendant told him he had been shot while sitting in the kitchen by someone in the alleyway outside. When this officer went into the back bedroom, he saw blood on the gun in the dresser drawer but did not see marihuana.

Based on the trial evidence, defendant requested that the court charge the jury on voluntary possession of the gun as follows:

> "Under our law, possession of the M[AC] 11, to be criminal
> must be voluntary possession of an M[AC] 11. It is voluntary
> when the possessor was aware of his or her physical possession
> or control of the M[AC] 11 for a sufficient period to have been
> able to terminate the possession."

The prosecutor objected, arguing that if the jury believed defendant's testimony, there was no way for it to find that he physically or constructively possessed the firearm at all, thereby making voluntariness irrelevant. Contrary to the dissent's mischaracterization of the record (dissenting op at 6), the court readily recognized defense counsel's "point" in seeking the instruction and actually clarified for the prosecutor that defendant's testimony was that "he

didn't have [the firearm] . . . long enough to be considered a voluntary possession" and that, "if the jury were to take defendant's testimony and be convinced by it or allow it to create reasonable doubt, then they can't find that he possessed it knowing[ly] and unlawful[ly]." Further, it noted that the proposed instruction came "right out of the definition section of culpability in the Penal Law." However, the court believed that the voluntary possession instruction was "more confusing than helpful" and therefore denied the requested charge.

As to possession, the court instructed the jury as follows:

> "'Possess' means to have physical possession or otherwise to exercise dominion or control over tangible property . . .
>
> "A person possesses property in either of two ways. First, a person may have physical possession of it by holding it in his hand or by carrying it on his person or body. Second, a person may exercise dominion, which really is another word for control, right, dominion or control over property not in his physical possession. A person who exercises such dominion or control over property not in his physical possession is said to have that property in his constructive possession.
>
> "Under our law, a person has tangible property in his constructi[ve] possession when that person exercises a level of control over the area in which the property is found, or over the person from whom the property is seized, sufficient to give him the ability to use or dispose of that property."

The court also explained that,

> "part of this count is that a person knowingly possess a firearm when that person is aware that he is in possession of the firearm . . .
>
> "The question naturally arises how to determine whether a person had the knowledge, that is, the awareness, required for the commission of a crime; and in this case, required for knowing possession of this firearm. To make that determination, you must decide if the required knowledge can

be inferred beyond a reasonable doubt from the proven facts. In doing so, you may consider the person's conduct and all of the circumstances surrounding that conduct, including, but not limited to what, if anything, that person did and said.

"Further, an act of possession of property by a person permits the inference that such person knows what he possess[es]. Thus, if you find beyond a reasonable doubt that the defendant was, in fact, in possession of this exhibit, the firearm that has been described as the M[AC] 11, then you may. But you are [*sic*] don't have to, infer from that fact that he knew that he possessed that exhibit, the M[AC] 11."

In summation, defense counsel urged the jury to consider the meaning of "knowing possession with intent" and "voluntary"; counsel did not specifically argue that defendant had not voluntarily possessed the MAC 11. In turn, the prosecutor told the jury that defendant had knowingly possessed the firearm and had the ability to either use it or dispose of it.

During deliberations, the jury requested, and the court provided, further instructions and written copies of the definitions of "possession," "knowingly," and "intent." Those instructions essentially repeated, without expounding upon, the instructions as originally charged.

The jury acquitted defendant of fourth-degree criminal possession of the loaded firearm found in the kitchen and second-degree criminal possession of the MAC 11 with the intent to use it unlawfully against another but convicted him of third-degree possession of the MAC 11 and unlawful possession of marihuana. The court rejected defendant's application for youthful offender status and sentenced defendant to three years' incarceration and three years' postrelease supervision on the weapons possession conviction and imposed a $25 fine for the marihuana conviction.

The Appellate Division modified and, as so modified, affirmed and remitted the matter to Supreme Court for a new determination of defendant's application for youthful offender status and resentencing (*People v J.L.*, 164 AD3d 523, 524-525 [2d Dept 2018]).[1] The Court summarily rejected defendant's challenge to the jury instructions (*id.* at 524). A Judge of this Court granted defendant leave to appeal (33 NY3d 950 [2019]).

Defendant limits his appeal to challenging his conviction of third-degree possession of a weapon. He argues that the trial court erroneously denied his request to instruct the jury on voluntary possession because there was a reasonable view of the evidence that, to the extent he possessed the weapon at all, such possession was not voluntary. Defendant contends that the error warrants a new trial on this count. Defendant is correct on both points.

A trial court must instruct the jury on "the material legal principles applicable to the particular case, and, so far as practicable, explain the application of the law to the facts" (CPL 300.10 [2]). The charge "must be tailored to the facts of the particular case" (*People v Baskerville*, 60 NY2d 374, 382 [1983]), including instructing the jury on expanded statutory definitions when necessary (*People v Medina*, 18 NY3d 98, 104 [2011]). In determining whether to issue a particular instruction, the court "must view the evidence adduced at trial in the light most favorable to the defendant" (*People v Zona*, 14 NY3d 488,

---

[1] The sentencing court originally denied defendant's application for youthful offender status. On appeal, the Appellate Division determined that the denial was in error and remitted for resentencing (*J.L.*, 164 AD at 525). Upon remittal, Supreme Court vacated the sentence, adjudicated defendant a youthful offender, and resentenced him to a prison term of one to three years.

493 [2010]). "The charge must be given if there is evidence reasonably supportive of the defense, even if there is other evidence which, if credited, would negate it" (*People v McKenzie*, 19 NY3d 463, 466 [2012]). A jury charge that ignores the factual contentions of either the prosecution or defense "cannot be countenanced" (*People v Bell*, 38 NY2d 116, 120 [1975]).

After considering the record "most favorably to defendant," our task is to determine "whether the trial court's charge to the jury was adequate" (*Padgett*, 60 NY2d at 144-145). If, "on any reasonable view of the evidence, the fact finder might have decided" in defendant's favor had it heard the requested charge, "the failure to charge . . . constitutes reversible error" (*id.*). Only when there is "*no* reasonable view of the evidence [that] would support a finding of the tendered defense [is] the court" relieved of its "obligation to submit the question to the jury" (*People v Watts*, 57 NY2d 299, 301 [1982] [emphasis added]). Put another way, if there is a reasonable view of the evidence that supports the defense, regardless of evidence to the contrary, the court is without discretion to deny the charge, and error in this regard requires reversal and a new trial.

Here, viewing the evidence in the light most favorable to defendant, as we must, evidence admitted at trial supports defendant's requested charge on voluntary possession. Third-degree criminal possession of a weapon must be knowing and voluntary (Penal Law § 265.02; *see also People v Saunders*, 85 NY2d 339, 341-342 [1985] ["(T)he corpus delicti of weapons possession . . . is the voluntary, aware act of the possession of a weapon"]; *People v Persce*, 204 NY 397, 402 [1912] ["Of course, the possession (of a weapon) which is meant is a knowing and voluntary one"]). The charge given to the jury, when read in its

totality, was inadequate because it failed to explain that the jury must return a verdict of not guilty if it found defendant knowingly possessed the gun, albeit for an insufficient period of time to terminate the possession. In other words, if the jury found that defendant's possession—physical or constructive—was so fleeting that he did not have time to affirmatively end the possession, then the possession was involuntary. While the court defined possession that is "knowing," it did not define possession that is "voluntary." Rather, to communicate the element of voluntariness, the court relied on its explanations of constructive possession of the area where the gun was found and the requirement that defendant had knowing possession—i.e., an awareness of the gun. But the charge on constructive possession and awareness did not address the temporal aspect of voluntary possession. As the court itself explained, defendant requested the charge to allow the jury to find that he did not have the gun in his possession for the requisite *period of time*, that is, "long enough to be considered a voluntary possession."

Defendant correctly argues that the trial evidence was reasonably supportive of the view that even if he had knowing and constructive possession of the MAC 11, such possession was not voluntary. A reasonable juror could have found that defendant, then a 17-year-old, was shot in the neck while in someone else's home, and, in the frantic moments afterwards, while searching for a towel to stanch the bleeding, came close enough to the drawer to both see an object that he thought looked like a gun inside it, and to transfer his DNA to the weapon by bleeding on it (even though he may never have touched it).[2]

_____

[2] Although the dissent dismisses as "unreasonable" the conclusion that defendant never touched the gun (dissenting op at 9), the prosecution's own witness admitted that that was

Viewed in the light most favorable to defendant, this evidence supports a finding that he had constructive possession of the MAC 11—by virtue of his access to and control over the room where it was found—and that this possession was knowing once he became aware of the presence of the gun, but also that his possession was not voluntary, given that it lasted for only the brief period between when he ran into the bedroom and saw the gun in the dresser and when he left the bedroom.

That defendant's primary defense may have been that he lacked constructive possession altogether because he did not have sufficient dominion and control over the bedroom in the first instance does not alter our conclusion that defendant was entitled to the voluntariness charge. Furthermore, there is no support for the prosecution's suggestion that a defendant's concession of knowing constructive possession is a prerequisite for a jury instruction regarding involuntary possession (*McKenzie*, 19 NY3d at 466). The existence of evidence that appeared inconsistent with the asserted defense of involuntary possession does not lead to a different result. As the Court explained in *People v Butts*, "inconsistency in claimed defenses or even between a defendant's testimony and a defense 'should not deprive [the] defendant of the requested charge' if the charge would otherwise be warranted by the evidence" (72 NY2d 746, 750 [1988], quoting *Padgett*, 60 NY2d at 146; *see also McKenzie*, 19 NY3d at 466 ["The charge must be given if there is evidence

---

a possibility (*see* n 3 *infra*). However, even if the only reasonable view of the evidence suggested that defendant touched the gun during his frantic search for a towel after being shot in the neck, that alone would not preclude the voluntariness charge, as the question would remain as to whether his possession lasted long enough for him to dispose of the weapon.

reasonably supportive of the defense, *even if there is other evidence which, if credited, would negate it*"] [emphasis added]). The rule serves as a bulwark against judicial intrusion into the fact-finding province of the jury. Nevertheless, the prosecution's argument— seized upon by the dissent (dissenting op at 8-9)—that defendant's story is contradicted by the evidence is an invitation for us to assess the relative strength of the evidence adduced at trial, which, of course, we cannot do (*see McKenzie*, 19 NY3d at 466 ["(V)iew(ing) the evidence in the light most favorable to the defendant . . . (is) an exercise understood to be incompatible with weighing the evidence to resolve competing inferences"]; *Butts*, 72 NY2d at 750).[3]

Nor did the court's instruction to the jury expanding on the definitions of "constructive" and "knowing" possession remedy the court's failure to give the voluntariness charge. The charge as given simply explained that the defendant could be

---

[3] The dissent, in disputing our holding today, repeatedly resolves competing inferences in favor of the prosecution, in contravention of our longstanding rule that, when "determining whether to instruct a jury on a claimed defense, the court *must* view the evidence . . . in the light most favorable to the defendant" (*Zona*, 14 NY3d at 493 [emphasis added]). For instance, while the dissent credits the testimony of an investigating officer when he stated that he collected only "DNA skin cells" on the MAC 11, the dissent simultaneously disregards the testimony of the criminalist, who stated that it was only *possible* that the DNA came from skin cells. But, as she explained, "there is no way to determine . . . exactly the source of the DNA. The DNA could have been skin cells. Could have been in blood." Indeed, this testimony is an explicit concession that the physical evidence *could reasonably support* defendant's theory of the case—the theory the dissent discredits as "fanciful." That the dissent—or more appropriately the jury—might ultimately believe the prosecution over the defendant is irrelevant to our assessment of whether the requested charge should have been given. Contrary to the dissent's claim (dissenting op at 9), we do not manufacture a theory to support our conclusion but engage in judicial review in accordance with the legal doctrine—a far cry from the selective reading of the record in favor of the prosecution underlying the dissent.

found guilty if the jury determined that he had control over the *area* in which the contraband was found rather than physically possessing the weapon. The charge thus failed to explain that the jury could consider whether defendant had sufficient time to dispose of the gun once he became aware of its presence in the area that he purportedly controlled. The jury was not instructed that it could find that defendant's awareness of his possession was fleeting—because, for  instance, defendant only learned of the gun's presence when he first ran into the bedroom to get a towel to stop the bleeding from his gunshot wound, and because any potential control lasted for only a few moments until he ran upstairs to ask the neighbor to call 911. And, of course, the constructive possession charge's focus on defendant's "level of control *over the area*" in which the contraband was found is utterly silent on the temporal aspect of voluntary possession.

The distinction among constructive, knowing, and voluntary possession that defendant emphasizes is reflected in the Criminal Jury Instructions' model charge on voluntary possession, which provides that "[p]ossession . . . is voluntary when the possessor was aware of [their] physical possession or control . . . *for a sufficient period* to have been able to terminate the possession" (CJI2d [NY] Voluntary Possession § 15.00 [2] [emphasis added]). As the Court has emphasized, the model charges contain the "preferred phrasing" of legal instructions (*People v Cubino*, 88 NY2d 998, 1000 [1996]; *see also* Steven W. Fisher, *Pattern Instruction For Jurors In Criminal Cases Seek To Explain Fundamental Legal Principles*, 73 NY St BJ 29, 30-31 [Jun 2001]  ["(T)he Committee on Criminal Jury Instructions continues to have as its principal objective the production of jury charges that correctly and concisely state the law in a way that lay jurors can

understand. Little is more important to the success of our criminal justice system"]). It makes little sense to convey the important legal principle of voluntary possession by implication alone, while declining to provide a pattern jury instruction that addresses it explicitly.

In any case, the trial court denied the charge here, not because the requested charge lacked evidentiary support, but because the court considered the proposed language more confusing than helpful.[4] This determination was in error because the requested charge did *not* inject confusion into the instructions. Rather, it addressed an entirely different aspect of the charged possessory crime: the temporal requirement of voluntary possession. Indeed, the requested charge would have clarified the law because the charge, as erroneously given, allowed the jury to conclude that if defendant had control over the area where the gun was

---

[4] The dissent admits that "the jury could conclude that [defendant] had constructive possession of the room" because, for example, he testified that he paid $100 to stay in the room where the gun was found (dissenting op at 8); it also acknowledges defendant's testimony that he saw something like a gun in that room (*id.*). And yet the dissent claims that defendant's "testimony must be discarded almost in its entirety" to conclude that he had knowing but involuntary possession of the weapon (*id.*). However, even if it were true that defendant's testimony, on its own, did not warrant the requested charge, the dissent has already conceded that the prosecution's evidence *did* reasonably support a view that defendant constructively possessed the room. This evidence, coupled with defendant's testimony that he had a fleeting awareness of the weapon in the room, demonstrates that the charge was warranted. As is obvious from our holding in *People v Steele* (26 NY2d 526, 528-529 [1970]), viewing the evidence in the light most favorable to defendant does not require us to credit every word of his testimony. In *Steele*, we held that the defendant's testimony that she had an alibi and was not present during the alleged shooting did not preclude an instruction on justification when the prosecution's evidence supported that charge. The dissent's invocation of *Steele* is rather perplexing, then, as the case makes plain that, "[s]ince a jury might disbelieve the [defendant's alibi testimony] and still find, on the prosecution's evidence, that [the defendant] acted justifiably," any inconsistency between that testimony and the defense is "not a bar to the charge requested" *(id.)*.

found—i.e., the bedroom—then he had constructive possession of the gun, regardless of how long he was actually aware of its presence. This is not an accurate statement of the relevant law where, as here, there is a reasonable view of the evidence that the possession may not have been voluntary.

Notably, the jury acquitted defendant of criminal possession of the other firearms in the apartment, which he testified he had no knowledge of, suggesting that the jury at least partially credited his testimony.[5] With respect to the MAC 11, however, defendant testified that he had *some* awareness of it—enough to sketch a drawing of it for the police. In the absence of an instruction explaining that this awareness had to last for a sufficient amount of time for possession to be voluntary, the jury could very well have assumed that defendant's fleeting knowledge alone was enough to find that he constructively possessed the firearm. Moreover, "the jury's confusion concerning the concept of [possession] is evident from its own messages to the court during deliberations" (*Medina*, 18 NY3d at 105-106), when the jurors requested additional instructions on, and written copies of, the definitions of "possession" and "knowingly" (*id.* at 106). Ultimately, here, "the instruction[s] did not adequately convey the meaning of [possession] to the jury and instead

---

[5] The dissent argues that the MAC 11 could only have ended up in the drawer if defendant placed it there, and that any contrary explanation involves irrationally believing that the weapon was "secretly plant[ed]" (dissenting op 8 n 5) by "some nonexistent third party" (*id.* at 9). The record suggests, however, that the apartment was occupied before defendant arrived mere hours before the shooting. The dissent's insistence on reading the evidence in the prosecution's favor is but another example of the dissent ignoring our well established law that, in determining whether the instruction should have been given, we are obligated to view the evidence in the light *most favorable* to defendant. Unlike the dissenters, we are unwilling to shirk that obligation.

created a great likelihood of confusion such that the degree of precision required for a jury charge was not met" (*id.* at 104).

Therefore, we have no difficulty concluding that the denial of the charge on voluntary possession constitutes reversible error warranting a new trial. As a matter of first principle, "unless the proof of the defendant's guilt, without reference to the error, is overwhelming, there is no occasion for consideration of any doctrine of harmless error" (*People v Crimmins*, 36 NY2d 230, 241 [1975]; *People v Mairena*, 34 NY3d 473, 484 [2019] ["Under our traditional harmless error analysis, an appellate court does not reach the question of prejudice unless the evidence is overwhelming in the first instance"]). The evidence here is not overwhelming.

As the record demonstrates, the officers' testimony corroborated much of defendant's testimony of the event—there was no dispute that he was inside the apartment when he was shot and then went into the bedroom where the officers later discovered the MAC 11. Defendant's fingerprints were not on that gun—or any other weapon in the apartment—and the criminalist testified that she could not say when or how defendant's DNA got on the gun, and she conceded that the DNA transfer could have occurred without defendant touching the gun. At least one officer testified that he saw blood on the gun. This evidence supported the view that defendant's blood may have dripped on the gun as he was looking for a towel. Defendant's age at the time of the shooting, evidence that he was smoking marihuana and suffered a serious gunshot wound moments before running into the bedroom, and that he was interviewed at the hospital while undergoing treatment were

all factors that a jury could rely on to explain minor inconsistencies in his statements, rather than confirming his consciousness of guilt. Moreover, the prosecution presented no evidence that defendant lived at the apartment or that he was the sole tenant. The envelope found in the bedroom was addressed to defendant at a different Brooklyn address, supporting his claim that he did not reside in the apartment and that his stay at the apartment with Paul would be short lived. That interpretation of the facts was also supported by the officer's testimony that the bedroom with the MAC 11—where defendant ran while looking for a towel and where he said he would have slept that night—appeared unlived in, perhaps even under construction, and contained no evidence of a permanent tenant, in stark contrast to the other bedroom, where officers found a fully made bed and personal possessions.

In sum, a reasonable juror could have credited defendant's testimony and concluded that he had constructive, knowing, but not voluntary, possession of the gun in question for a brief moment. Thus, the jury should have been instructed regarding the definition of voluntary possession, and the failure to so charge was not harmless.

Accordingly, the Appellate Division order insofar as appealed from should be reversed and a new trial ordered on the count of criminal possession of a weapon in the third degree.

DiFIORE, Chief Judge (dissenting):

I agree with the general principles of law set forth in the majority opinion. I cannot, however, agree with the contrived and unreasonable view of the evidence embraced by the majority to support its conclusion that defendant was entitled to a jury charge on the legal definition of a voluntary act in the context of a possessory crime. Since there is no reasonable interpretation of the evidence, viewed in the light most favorable to defendant, that would support the requested jury charge, I would affirm.

I.

It is undisputed that, at approximately 1:45 am on August 15, 2010, the police, responding to a 911 call, found defendant sitting outside on the front steps of a house, bleeding from a gunshot wound to the neck. Defendant was shot by an unknown assailant from the driveway outside of the building while he was in the kitchen of the basement apartment. When the police entered the downstairs apartment to investigate, no one else was present. They found a loaded MAC-11 submachine gun in an open dresser drawer of the first bedroom—the bedroom closest to the spiral staircase leading upstairs to the outside front steps where defendant was found by the police. The assault weapon was resting on top of mail that was addressed to defendant at a different address. A 16-loci profile of defendant's DNA was discovered in the biological materials collected in the swabbing of the weapon.

Although three police officers testified to seeing what appeared to their naked eyes to be blood stains (or rust or a dry red stain on the magazine) on the gun while it was in the drawer, no blood was visible in the photograph taken of the gun in the drawer. More importantly, the evidence collection officer who actually examined and swabbed the weapon for forensic testing "did not see any blood on the weapon[] when [he] processed [it]." Rather, the officer, who moistened the swabs with distilled water so that biological materials on the gun would better adhere to the swabs, testified that the biological material he collected was made up of "DNA skin cells." The officer swabbed three different areas of the weapon: one swab from the trigger and trigger guard, a second swab from the grip

area (front strap, back strap and side grips) and a third swab from the slide grip, groove area and magazine release.

The criminalist from the Office of the Chief Medical Examiner (OCME) testified that there was a mixture of DNA profiles developed from the swabs taken from the gun, a full 16-loci DNA profile of the major contributor was developed and defendant's DNA profile was the same as that of the major contributor found on the MAC-11. [1] The witness could not dismiss the possibility of the presence of blood on the gun, but testified that there was "nothing on the swabs to suggest, indicate or have an inkling" of the presence of blood—i.e., there was no red or brown discoloration on any of the swabs that warranted testing for the presumptive presence of blood. The criminalist also explained that she could not pinpoint which of the three specific locations swabbed on the MAC-11 as the source of defendant's DNA because, under the laboratory protocols in place at the time to conserve resources, a sample from each of the three swabs was combined for DNA testing.

Defendant's trial testimony, which was inconsistent and impeached, is proffered as the basis for the rest of the factual narrative needed to achieve a rational view of the evidence that would support the requested jury charge. [2] Defendant steadfastly denied dominion and control over the apartment, the bedroom and the contents of the drawer to defeat a constructive possession theory and was unequivocal that he never physically

---

[1] The two DNA profiles, when compared, were a 16-loci "exact match" and the profile would be expected to be seen "in the random population once in greater than 6.8 trillion people."

[2] Plainly, the account would be far different if viewed in the light most favorable to the People.

possessed the weapon. According to his version of events, he arrived at the apartment at 8:00 pm, less than six hours prior to the shooting. Kicked out of his aunt's residence in the Bronx, he met a person named "Paul" through a friend. He paid Paul $100 to allow him to stay at the apartment, but they did not reach any particular agreement as to the length of defendant's stay. Defendant inconsistently testified that he learned Paul's surname (Blake) for the first time in court and that he gave the police Paul's first and last names at the time of the investigation. The only thing defendant brought with him, other than the clothes on his back, was an envelope addressed to him at a different aunt's address in Brooklyn, containing documents relating to an insurance claim.[3] According to defendant, he placed his mail on top of the refrigerator in the kitchen and had "no idea" how, during the six hours he was in the apartment, it got into the drawer with the gun in the first bedroom.

Defendant and Paul were the only people in the apartment and, at the time of the shooting, both were in the kitchen "building a spliff to smoke." After the shooting, defendant saw Paul run up the spiral staircase—fleeing the scene—and defendant never saw him again. At no point in his testimony did defendant claim that during his brief stay Paul ever went into the first bedroom in order to plant defendant's mail, or the gun, or both, in the drawer. Nor is there any evidence of a third person in the apartment until the police arrived after the shooting. Indeed, it appears defendant's testimony was designed to support an inference that the police planted defendant's mail in the drawer.

---

[3] On cross-examination, when confronted with a photograph of the gun in the drawer, defendant admitted that there was "more of [his] mail up there on the top"—in addition to the envelope containing the insurance documents.

As to his knowledge of the assault weapon in the drawer alongside his mail, defendant testified that his first and only entry into the first bedroom was after he was shot, in order to get a towel for his wound. He maintained that the door to the second bedroom, closer to the kitchen, was locked (although it was not locked when the police arrived). Defendant conceded that he was planning to sleep in the first bedroom that night. In his direct testimony, defendant asserted that he had been focused on finding the towel and did not recall whether or not the dresser drawer was open. On cross-examination, defendant was confronted with a prior inconsistent statement he made to the investigating detective— wherein he told her that, when he went into the bedroom, he opened the drawer, saw the gun and picked it up.[4] Defendant denied making that statement or ever touching the gun. Rather, he asserted that he told the detective, "maybe I seen the gun, something like a gun." When he was further confronted with whether he also drew a picture of the gun for the detective, he acknowledged that he drew a picture of what he saw in the drawer. "I didn't tell her I seen a gun. I told her, I've seen something like this. I draw it and give it to her. I didn't say, I see a gun."

At the charge conference, defense counsel asked the court to instruct the jury on the statutory definition of a voluntary act, as set forth in the model charge in the New York Criminal Jury Instructions (*see* Penal Law § 15.00 [2] ["includ(ing) the possession of property if the actor was aware of his physical possession or control thereof for a sufficient

---

[4] The jury was instructed that "[t]he contents of any prior inconsistent statement are not proof of what happened. You may use the evidence of any prior inconsistent statement only to evaluate the truthfulness or accuracy of the witness' testimony here at this trial."

period to have been able to terminate it"]). Counsel did not make any factual argument in support of the requested charge. The court denied the request, after observing that it was "not sure how [the charge] fits in this case," given that, if defendant's testimony were to be believed, he did not possess the weapon at all. The court also opined that the instruction would be "more confusing than helpful," but concluded that defense counsel could argue that, even if defendant was aware of the gun, he was not aware of it for sufficient time to "rid himself of it." The court did provide the jury with expanded charges on the concepts of physical and constructive possession, as well as the mens rea of knowingly.

In summation, defense counsel argued that defendant did not possess the weapon at all and that the People failed to prove that he had control over the bedroom. Counsel did not direct any specific argument to the voluntary nature of the possession, other than telling the jury to "[l]isten to what the meaning of or the principle of knowing possession with intent and voluntary is."

As relevant here, the jury convicted defendant of criminal possession of a weapon in the third degree (*see* Penal Law § 265.02 [7]).

## II

"A court is required to instruct the jury on 'fundamental legal principles applicable to criminal cases in general' and those 'material legal principles applicable to the particular case'" (*People v Watts*, 57 NY2d 299, 301 [1982], quoting CPL 300.10 [1], [2]). "In evaluating a challenged jury instruction, we view the charge as a whole in order to determine whether a claimed deficiency in the jury charge requires reversal" (*People v Medina*, 18 NY3d 98, 104 [2011]). "The test is always whether the jury, hearing the whole

charge, would gather from its language the correct rules which should be applied in arriving at [its] decision" (*People v Drake*, 7 NY3d 28, 34 [2006] [quotation marks and citation omitted]).

In determining whether to give a jury charge on a claimed defense, the evidence must be viewed in the light most favorable to the defendant (*see People v Butts*, 72 NY2d 746, 750 [1988]). However, "the charge to the jury must be tailored to the facts of the particular case" (*People v Baskerville*, 60 NY2d 374, 382 [1983]) and a reasonable view of the facts must support the charge. Defendant's testimony or his proffered defense does not have to be consistent with the requested charge—we have held that the jury can accept or reject the defense or portions of it, so long as the evidence otherwise supports the charge (*see People v Zona*, 14 NY3d 488, 493 [2010]; *Butts*, 72 NY2d at 750; *see also Mathews v United States*, 485 US 58, 63 [1988]). "The rule is that the jury must be instructed on all claimed defenses which are supported by a *reasonable view* of the evidence—not by any view of the evidence, however artificial or irrational" (*Butts*, 72 NY2d at 750). "As a corollary, when no reasonable view of the evidence would support a finding of the tendered defense, the court is under no obligation to submit the question to the jury" (*Watts*, 57 NY2d at 301).

Here, defendant maintains that, in the event his constructive possession of the assault weapon was proven, the court's charge on the law of possession was inadequate to convey the necessary legal principles to the jury because voluntary possession includes a temporal element that is not incorporated into the mens rea of knowingly (*see* Penal Law § 15.00 [2]; William C. Donnino, Practice Commentary, McKinney's Cons Laws of NY,

Penal Law § 15.00). Essentially, he contends there was a factual issue on the evidence presented as to whether he constructively possessed the gun for a sufficient period of time to allow him to terminate the possession, requiring the charge.

As the trial court pointed out, if the jury believed defendant's testimony, he was not guilty of possessing the weapon at all. Indeed, defendant was adamant both in his denial that he physically possessed the gun and in his lack of dominion and control over the bedroom. Nor did he admit that he saw the gun in the drawer—admitting only that he saw "something like" a gun when confronted with his prior inconsistent statement.

In order to construct the alternate narrative that defendant had knowing, but involuntary, possession of the gun, defendant's testimony must be discarded almost in its entirety. Given the People's evidence, the jury could conclude that defendant had constructive possession of the room, based on his statement to police of a payment of $100 to Paul, the presence of his personal belongings (mail) in the drawer and his DNA from touching the weapon.[5] However, there is no evidence in this record to support the fanciful

---

[5] Contrary to the majority's skewed view of our analysis, akin to the same skewed view it takes of the evidence presented at trial, the trial court could not reasonably conclude that defendant had constructive possession of the room on any portion of his testimony, as he went to great lengths to deny any form of possession (*see* majority op at 14 n 4). The voluntary act charge must be given on a view of the evidence in the light most favorable to the defendant, consistent with the rule that supporting evidence is not limited to the defense case, as "the jury may believe portions of both the defense and prosecution evidence" (*People v Steele*, 26 NY2d 526, 529 [1970]). Here, it is only the People's case that provided evidentiary support that defendant had constructive possession of the room and the contents of the drawer—including his personal mail—and, indeed, the jury convicted defendant on that basis. Since there is no factual evidence in either the People's or the defense case that, once defendant exercised a sufficient level of control over the room, anyone else had access to the drawer or its contents in order to secretly plant the gun, the charge was properly denied.

theory that, given defendant's dominion and control over the bedroom and the drawer containing his personal possessions, some nonexistent third party, unbeknownst to defendant, planted the gun containing defendant's DNA into the drawer on top of his personal mail. The jury would have to engage in pure speculation as to how the gun materialized in the drawer over which defendant had control for his six-hour stay in the apartment. Nor does the evidence support the unreasonable conclusion that defendant did not touch the gun, but inadvertently dripped his blood on it, and that the DNA on the swabs taken from the gun came from defendant's blood. Although the jury could have credited the police officers' testimony that they saw what they thought was blood on the *gun*, the gun itself was not tested for DNA—the swabs were. And the only evidence in the record concerning the swabs—from the evidence collection officer who actually processed the weapon and the OCME witness who performed the DNA testing—was that there was no visible indication of the presence of blood. Thus, "[n]o matter how the record is cut and spliced" (*Butts*, 72 NY2d at 751), it does not support a reasonable conclusion that defendant knowingly possessed the gun for a fleeting moment, rendering his possession involuntary because he had no time in which to terminate his sudden discovery of possession due to his gunshot wound. To the contrary, the theory manufactured by the majority is not based on any reasonable view of the evidence presented at trial.

In sum, under the circumstances, the court's charge properly conveyed the applicable legal principles to the jury and there was no error in the denial of defendant's requested charge.

Order insofar as appealed from reversed and a new trial ordered on the count of criminal possession of a weapon in the third degree. Opinion by Judge Rivera. Judges Stein, Fahey and Wilson concur. Chief Judge DiFiore dissents and votes to affirm in an opinion in which Judges Garcia and Feinman concur.

Decided December 17, 2020